Good morning. My name is Steve Labonte. I have the honor of representing Secretary of State William Gardner, who is asking to relay his regret for not being able to attend, but he's administering the New Hampshire State President's Office. No right is more precious in a free country than that of having the voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. The Supreme Court said that in person. I'm sure you're aware of that. I've mentioned it in my brief. For over 100 years now, the New Hampshire legislature has protected that right with RSA in one form or another with what is presently known as RSA 659-35, which is a reasonable restriction on the manner of speech, justified without reference to the content of the regulated speech, and is narrowly tailored to serve a significant governmental interest. Why is it reasonable if it's in response to a problem that may not exist? It certainly hasn't been proven to exist. It hasn't been proven to exist in the recent years. For how long? When was the last time New Hampshire prosecuted a case of vote buying or vote intimidation? I will concede that we have not recently voted. You answered in an interrogatory that you know of nothing since 1976, right? Yes, my client answered in an interrogatory. They didn't ask about the period before 1976. But are you going to offer any evidence that 30 years ago you had a problem with vote buying? I think it's well known that in the late 1800s there was a huge problem which caused us to have a country... Right, and what year is it now? I'm sorry, I didn't... In the late 1800s there was a problem which obviously did not include ballot selfies. They didn't exist then. What is the problem New Hampshire is facing now to which this restriction is a solution? Well, it's obvious with this case and it is often seen that with the advent of new technology, being digital photography, being most people have a camera on them at all times with their cell phones, voters are now taking the world into the voting booth with them. And that's their choice. What's wrong with that? Because that system can be used to intimidate and purchase votes. Do you have any evidence of that? None. I mean, that may be a scenario that can be spun out. It may meet some test of rationality in terms of it could happen. But this should be an evidence-based analysis in this First Amendment context. And as Judge Lynch has pointed out, there is no evidence of the verbatim or coercion that New Hampshire invokes as a rationale for this. Well, that's what Judge Robert Orr says. And I'm appealing to do nothing to challenge his conclusion. Well, we did point to vote-buying schemes, although they didn't use the technology that this statute was amended to address. I do agree with that. However, I think that's evidence that up until recent technology has been introduced that the statute works. And what the Burson decision stood for, the plurality in Burson responded to the dissent. But Burson is actually a case about the physical grounds in which voting takes place, where they locate the voting booths, and the effort to avoid purchasing of votes at the door of the voting booth. What does this have to do with that problem? Well, again, technology has changed since even Burson was released. And the simple fact is now, with technology, there is the ability to take the world into the voting booth with you. The whole premise of our system has been founded on the secret ballot. Ah, that's a different argument than the argument that you're avoiding vote-buying and vote intimidation. The secrecy of the voting place is mentioned just once in this record, and I did not actually see that as one of the state's justifications. But suppose the voter does not want it to be secret. The voter wants to make a political expression about the election by using what happens there. What justifies the state interfering with that choice by the voter? This is a restriction on one single manner. It doesn't block out a whole subject area. One single manner to deliver that message. I would suggest walking downstairs into the cafeteria and scraping at the top of my lungs who I intend to vote or who I may have already voted for. Why do you think that's a rational distinction? Because there are so many other options available to somebody who wants to express who they support in the election. Well, of course there are. But you've chosen to stop one particular method of expression. One, you know the old adage, a picture is worth a thousand words. Suppose somebody wants to use a picture and not a thousand words. What is the state's justification for blocking that choice? Because it opens up our whole electoral process. It undermines the whole electoral process. It opens up opportunities for those who are going to purchase elections to do so by direct proof of how someone voted. You have criminal laws against voter purchasing. I said you have criminal laws against voter purchasing. Yes, Your Honor, there are. So there are laws which specifically target that kind of illegal activity should it come to light that that has occurred. Right, that would prosecute one party, but that law does not address someone selling their vote. And it also, it strengthens and supports that law as well. It's simply the whole act of purchasing votes should be prohibited. And a legislature has to be able to... I'm sorry, the existing statutory scheme goes after, as defendants, those who attempt to purchase a vote from a voter. Attempt or successfully. Okay, and you're saying this law is justified because you'll create a market of voters selling votes that did not exist earlier? I think new technology can create that market, certainly. Is there any evidence that any such market has been created either in New Hampshire or in any of the other states? There is. I have not found evidence of that currently, but certainly with the publicity this case has gotten, we are vulnerable at this point. Well, there's at least one state, that would be Rhode Island, that just passed a regulation which says you can do voter selfies because of how young people respond to technology and how they perceive that it increases voter enthusiasm among young people. So that is, at least in my state, what has spawned from this litigation. And again, and that is for the Rhode Island legislature, that was a call for the Rhode Island legislature to make. Counsel, do you agree that whatever test we apply, whether it's strict scrutiny, intermediate scrutiny, that this law has got to be narrowly tailored to either meet a compelling state interest under strict scrutiny or a significant state interest under intermediate scrutiny? Do you agree that that narrow tailoring requirement applies here? It does, and I would argue also that this would meet both levels of scrutiny because of the compelling interest. How can you possibly characterize this law as being narrowly tailored when it sweeps into its ambit individuals like the plaintiffs here who simply want to, as Judge Lynch described it, sort of magnify their political preference, their political statement. No involvement in any vote buying or selling scheme, and as Judge Thompson pointed out with her question, there are laws in place that are designed to deal with that very phenomenon. It seems to me New Hampshire has sort of turned First Amendment analysis on its head and completely avoids the narrow tailoring requirement with a law like this. I just don't understand how you can characterize this as narrowly tailored. It's narrowly tailored that it only addresses one manner of speech, a ballot, the use of a ballot, a ballot which is created by the government so that the individual voters can convey to their government anonymously their choice of leaders. It's narrowly tailored because the individual can still announce in the cafeteria how he or she voted, but simply cannot demonstrate how he or she voted by showing a selfie of the ballot. That's what makes it narrowly tailored?  We're simply preventing, we're simply keeping the casting of a vote in the ballot booth. The previous way the law was written back in the 1900s, the voter only had the ballot for a brief moment of time. They got the ballot from the ballot clerk, they went into the voting booth, they marked their ballot, and then they submitted it into the box, into the voting box or ballot box. They no longer had possession of it. And once it's in the box, it's anonymous. So they couldn't prove to the buyer of the vote that they'd actually voted the way the buyer of the vote wanted them to vote. And that's the difference between now and then? Yes. And for the sake of an evidentiary question about purchasing votes, New Hampshire thinks it's all right to stop people from taking photographs of their vote? It just comes down to the ease of proof? I don't know that it comes down to the ease of proof. I think there's certainly, we want to be able to make sure that everyone can cast their ballot free of intimidation. And taking a picture of yourself somehow opens you up to the possibility of opening you up to intimidation that's greater than any other form of intimidation. I'm sorry, go ahead. The point I'm trying to make, for instance, if someone's telling you, if your boss is telling you, if you don't vote for my brother-in-law, for Selectman, you're going to get laid off next week. And I want you to text me a picture of you and your ballot in the ballot booth. And you can't prove that case without the evidence of the picture? Normally you would prove that case by testimony of the voter, whether or not he showed that photograph. If they're willing to cooperate, but if they're also worried about losing their job, how cooperative will they be? It's the usual problem in criminal cases. Yes, I've prosecuted election-related crimes before. I'm willing to take as many questions as you want to throw me to get my point across, but I do see my red light is on. You've gotten your point across, thank you. Thank you, Your Honor. Thank you. May it please the Court, I am Gilles Bissonnette with the American Civil Liberties Union on behalf of the plaintiffs in this matter. The challenged law here bans, as I think the State readily concedes and has conceded through the entire duration of this case, that the law bans innocent political forms of expression  namely vote-buying and voter coercion. I think that is the fundamental problem with the law that really necessitates the law being struck down, and that's precisely the reason the District Court did in striking it down among others. The First Amendment doctrine is, as you know, a minefield. So do we put your argument under overbreadth? Do we put your argument under it's not narrowly tailored? Do you agree that even if it's intermediate scrutiny, there is a narrow tailoring requirement? Excellent. That's a great point, Your Honor. Because I think it is difficult sometimes to differentiate between the substantial overbreadth analysis in U.S. v. Stevens and the narrow tailoring requirement which exists in form-based speech restrictions. Our argument is both. It is that if this Court elects to use the form-based speech restriction doctrines of intermediate scrutiny and or strict scrutiny, the law should be struck down on narrow tailoring grounds, even if the law is content neutral. As the U.S. Supreme Court held in McClellan v. Coakley, striking down a 35-foot content-neutral buffer zone. As this Court held in Cutting v. City of Portland, striking down a content-neutral median band. Counsel, does narrow tailoring allow for a prophylactic justification for a state initiative like this? I ask that question because I think what Mahershala is arguing is, look, we understand that the plaintiffs here, they're not involved in vote-by or coercion. And there are probably a lot of people just like them who want to magnify their political expression by taking a selfie and showing it to the world. We understand that. But unless we take measures to prevent that, we are going to have problems of voter coercion and vote-binds. So prophylactically, we have to take this measure to prevent that preceding problem. Are they entitled to do that? I think the answer is no. Certainly, if this was a conduct-based restriction, the court would have, the legislature, I should say, would have tremendous flexibility in enacting prophylactic rules, even in the absence of evidence that there's a particular problem. But I think even if this court were to apply intermediate scrutiny, it needs to show some evidence. I think the court, this court mentioned that in the Associación de Educación Privada case. But what the district court concluded, we think correctly, is that if this court concludes... You know, courts also are supposed to narrowly tailor their opinions and not decide more than we actually have to decide. I can understand why the ACLU would want to go off on content-based. But you've also said intermediate scrutiny, it fails even that. So perhaps you'd focus on intermediate scrutiny. Absolutely, Your Honor. And I think that would be a way for this court to rule in plaintiff's favor to avoid the question of whether there's a compelling or even significant governmental interest and decide this case strictly on tailoring, you know, as the U.S. Supreme Court did in McClellan. And I'll get to tailoring, but I do just want to articulate the fact that we had preserved from the outset our substantial over-breath argument as an independent claim. The reason that we've integrated it to our analysis in the brief, we didn't separate it out simply because the district court adopted a forum-based analysis. But I do think, Your Honor, the law really here does fail on tailoring grounds. And I think the McClellan case is particularly instructive, where it talks about how if a government wants to enact a speech restriction that sweeps within its scope even speech unrelated to the governmental interests that are being raised, it must present evidence showing that less restrictive alternatives will not adequately address the interests asserted. Here, it's not in dispute, I think, that before this law was passed, the New Hampshire legislature tried nothing, tried no alternatives to try to get at this perceived problem of vote buying and voter coercion. And in fact, I would submit that I believe the entire claim in this case that is on the part of the state is really based on speculation, speculation that the innocent display of a marked ballot is somehow going to lead to criminal acts and speculation that the law's objectives cannot be achieved through alternative means. And here it seems to me, at least, that the more narrowly tailored approaches here are obvious. The state could investigate and prosecute vote buying and voter coercion transactions. Existing New Hampshire law does allow for a conspiracy charge for someone who's involved in a vote bribery scheme. The legislature could have also, or I should say the Attorney General's office, could investigate people who post, quote, ballot selfies online and see whether they're part of a vote bribery or voter coercion transaction. Suppose this hypothetical just occurred to me. Suppose they put it in the lawn to advertiser. I'm willing to sell my vote and I'm willing to give you proof afterwards. Does the existing structure of law allow the Attorney General to prosecute that? I believe it does because that is, I think, a vote buying conspiracy. While you're talking about, I suppose, there hasn't necessarily been an engagement with a third party. Correct, but there isn't an attempt. That's a great question. I actually don't know the answer to that without looking more carefully at the law. But what I do think is that if that individual engages someone who is willing to buy, there is a conspiracy interaction among those two, and the person who is willing to sell their vote would be caught up within the scope of existing criminal law. I'm sorry to say I don't have a direct answer to your question. Yeah, you won't be surprised that it goes along with the question of, suppose New Hampshire had enacted the intent restriction that the minority urged. In your view, is that adequate or are you going to tell me we'll face that when we know? No, Your Honor. I actually would concede that I think that's constitutional in nature. And that was actually the other more narrowly tailored approach that I was going to get at, is as you mentioned, Judge Lynch, the legislature could have said a display of a marked ballot is illegal if it's done as part of a vote bribery or voter coercion scheme, something that was considered by a minority of the House Criminal Justice Committee but rejected. That is something that I think should have wisely been adopted because we wouldn't have the result that we have here, which is scores if not hundreds of individuals who are engaged in this powerful form of expression are now barred from doing so even though that form of expression is untethered to any form of criminal activity. There's a hint in the state's argument that, let's put aside conviction of prosecutions, but that they are free to go investigate people as the three plaintiffs were investigated here without any sort of recognition of the chilling effect that that would have. Merely being contacted by an investigator and being asked questions itself strikes me as an infringement on First Amendment interests. It very well could be. I think the question is whether. It very well could create a chill. I think the question would be whether that's of constitutional dimension. I'm not so sure. I mean, law enforcement and government investigators from the Attorney General's office do have the opportunity and should have the opportunity to engage members of the public, even in the absence of probable cause, to see whether or not criminal activity is afoot. But what we have here is something altogether different. It's undisputed. Well, like the guy who says, vote for my dog. Yes, exactly. I mean, it's sort of self-evident that that's political dissatisfaction speech. Absolutely. And yet they choose to investigate that in any event, taking the statute literally in a way that does not conform with their stated purposes. Absolutely, Your Honor. There's been no dispute in this case that the three plaintiffs, if I may briefly. Yes, you may. That the three plaintiffs in this case were engaging in forms of political expression that had nothing to do with vote buying and voter coercion. There's also been no dispute that the statute, based on its plain terms, also deems a violation-level offense innocent speech, political speech, that has nothing to do with vote buying and voter coercion. And with that, the plaintiffs would ask that the district court's decision be affirmed. Thank you. Thank you, Your Honor.